UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BARTON WILLIAMS,<br><br>    Plaintiff,<br><br>v.<br><br>LAURIE SMITH,<br><br>    Defendant. | Case No. 20-cv-08560-VKD<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 24 |

Pro se plaintiff Barton Williams, a state prisoner at Kern Valley State Prison ("KVSP"), asserts a claim under 42 U.S.C. § 1983 against defendant Laurie Smith for violation of his Eighth Amendment rights during the six weeks he was temporarily housed at the Santa Clara County Jail ("County Jail") in 2018. Dkt. No. 1-1 at 5-7. Specifically, Mr. Williams claims he suffered needlessly due to the deliberate indifference of County Jail medical staff who refused to provide the pain medication prescribed by state prison doctors to treat his chronic pain.[1] *Id.* at 6-8. Mr. Williams brings this action solely against Sheriff Laurie Smith based on a theory of supervisor liability. *Id.* at 1. He seeks declaratory relief and damages. *Id.* at 9. All parties have consented to magistrate judge jurisdiction. Dkt. Nos. 7, 11.

Defendant Laurie Smith moves for summary judgment on the following grounds: (1) no state actor was deliberately indifferent to Mr. Williams's serious medical needs; and (2) defendant Smith is not liable as a supervisor with respect to the County Jail's handling of Mr. Williams's pain medication. Dkt. No. 24 at 1.

---

[1] In its screening order, the Court dismissed Mr. Williams's Fourteenth Amendment due process claim for failure to state a claim upon which relief may be granted. Dkt. No. 13 at 4-5.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted[2]:

### A. Parties

Mr. Williams is a state prisoner who was transferred from KVSP to the County Jail on August 23, 2018, to attend court proceedings in a criminal case against him. Dkt. No. 1-1 at 5, ¶ 1; Dkt. No. 28 at 2. Mr. Williams remained at the County Jail until October 3, 2018, when he was transferred back to KVSP. Dkt. No. 24-1 ¶¶ 3, 8; Dkt. No. 28 at 2.

Defendant Laurie Smith is the Sheriff of Santa Clara County, a position she has held since January 1998. Dkt. No. 24-3 ¶ 2. She is responsible for overseeing the following bureaus: Administrative Services, Enforcement, Custody and Support Services. *Id.* The Custody Bureau includes a division that encompasses the county's jail facilities where Mr. Williams was housed while in temporary county custody. *Id.*

### B. Mr. Williams's Medical Care Prior to Arriving at County Jail

In support of her motion, Sheriff Smith relies on the declaration of Dr. Alex Chyorny, the Medical Director of the Adult Custody Health Services ("ACHS"). Dkt. No. 24-1 ¶ 2. ACHS is a department of the Santa Clara Valley Health and Hospital System ("HHS") and provides all medical, mental health, and dental services to adults incarcerated by the Santa Clara County's Sheriff's Office and Department of Correction, including prisoners housed at the County's Main Jail Facility and Elmwood Correctional Facility. *Id.* As Medical Director, Dr. Chyorny oversees all aspects of medical care provided to those prisoners. *Id.* Mr. Williams does not dispute those portions of Dr. Chyorny's declaration describing Mr. Williams's medical history. *See* Dkt. No. 28.

According to Dr. Chyorny, Mr. Williams's medical records reflect that prior to arriving at the County Jail, Mr. Williams experienced chronic right knee and right ankle pain associated with injuries he sustained in a 2010 motorcycle accident. Dkt. No. 24-1 ¶ 9; Dkt. No. 24-2 at 20 (Ex. D

---

[2] As Mr. Williams has filed a verified complaint, Dkt. No. 1-1, the Court may rely on statements of fact in the complaint that he is competent to assert as if they were made by declaration. *Schroeder v. McDonald*, 55 F.3d 545, 460 (9th Cir. 1995) ("A verified complaint may be used as an opposing affidavit under Rule 56 [if it is] based on personal knowledge and set[s] forth specific facts admissible in evidence.") (internal citation omitted).

at 3001).³  In July 2018, Mr. Williams was receiving Nortriptyline for pain control as prescribed by KVSP doctors.  Dkt. No. 24-1 ¶ 9; Dkt. No. 24-2 at 21-22 (Ex. D at 3002-3003).  However, on August 2, 2018, a state prison doctor substituted Trileptal for Nortriptyline because Mr. Williams had an allergic reaction to Nortriptyline.  Dkt. No. 24-1 ¶ 9; Dkt. No. 24-2 at 23-25 (Ex. D at 1965-1963).  During an examination on August 16, 2018, Mr. Williams expressed dissatisfaction with Trileptal and became angry when told that narcotic pain medication was not appropriate for his chronic pain condition.  Dkt. No. 24-1 ¶ 9; Dkt. No. 24-2 at 27-31 (Ex. D at 2996-3000).  The progress notes for the August 16, 2018 examination indicate an increase in the Trileptal dose from 300 mg twice a day to 600 mg twice a day.  Dkt. No. 24-2 at 30 (Ex. D at 2999).  The notes also indicate that Mr. Williams should attend a follow up examination in 40 days.  *Id.* at 29.

### C.   Mr. Williams's Medical Care at the County Jail

In his declaration, Dr. Chyorny also describes the medical care Mr. Williams received at the County Jail from August 23, 2018, through October 3, 2018.  Dkt. No. 24-1 ¶ 3, Ex. B.  Mr. Williams does not dispute those portions of Dr. Chyorny's declaration describing Mr. Williams's medical care at the County Jail.  *See* Dkt. No. 28.

According to Dr. Chyorny, Mr. Williams's medical records reflect that when he arrived at the County Jail on August 23, 2018, the County Jail received a transfer packet indicating that Mr. Williams was taking Trileptal (600 mg twice daily) for chronic knee pain, using a cane and leg brace, and was awaiting a physical therapy consultation by December 2018.  *Id.* ¶ 4; Dkt. No. 24-1 at 50-53 (Ex. C); Dkt. No. 1-1 at 5, ¶ 2.  A nurse at the County Jail assessed Mr. Williams upon his arrival.  *Id.* ¶ 4; Dkt. No. 24-1 at 7-11 (Ex. B at 1-5).  The intake nurse noted that Mr. Williams used a cane and right knee brace, and she also noted other aspects of his medical and mental health history.  *Id.*  The nurse ordered initiation of ACHS's standard procedures for treatment of Mr. Williams's medical conditions.  *Id.*  The County Jail also assessed Mr. Williams for mental health issues that might require attention.  Dkt. No. 24-1 ¶ 4; Dkt. No. 24-1 at 12-13 (Ex. B at 6-7).

After the initial assessment by the intake nurse, an ACHS physician ordered that Mr.

---

³ The referenced portions of Mr. Williams's medical records are attached as Exhibit D to Mr. Schmid's declaration.  Dkt. No. 24-2 at 3-75.

Williams be given 600 mg of Ibuprofen[4] three times a day instead of 600 mg of Trileptal twice a day pending an examination by an ACHS physician. Dkt. No. 24-1 ¶ 4; Dkt. No. 24-1 at 14 (Ex. B at 8). Dr. Chyorny asserts that Trileptal is "not a usual/accepted treatment for knee or ankle pain," and it is "not a benign medication as it can cause serious blood/liver toxicity and needs to be followed closely with regular blood test monitoring." Dkt. No. 24-1 ¶ 4. Dr. Chyorny also asserts that Ibuprofen is an "appropriate first-line alternative" for Mr. Williams's presumed arthritic pain pending first available medical appointment, which at that time was scheduled to occur in approximately six weeks on October 11, 2018. *Id.*; Dkt. No. 24-1 at 37 (Ex. B at 31). Mr. Williams does not specifically address Dr. Chyorny's assertions regarding the advantages or disadvantages, side effects, or appropriateness of Ibuprofen as compared to Trileptal, except to say that Ibuprofen was not effective. *See* Dkt. No. 28 at 3.

Mr. Williams says that he informed the intake nurse that his current prescription for Trileptal was "totally inadequate and that his pain had gotten worse and was intolerable," and that in response, the nurse "assured [him] that he would be seen by a licensed physician the following day to re-evaluate his condition." Dkt. No. 28 at 3. Mr. Williams was not seen by a doctor the next day. *Id.* Mr. Williams's medical records reflect that during a welfare check related to his medical equipment on August 24, 2018, Mr. Williams mentioned ongoing chronic pain but did not mention a pending request to see a doctor. *Id.* at 14 (Ex. B at 8).

From August 26, 2018 to September 10, 2018, Mr. Williams submitted multiple white cards (medical request forms), asserting many complaints. *Id.* ¶ 5; Dkt. No. 24-1 at 14-22 (Ex. B at 9-16). Specifically, Mr. Williams submitted white cards on August 26, 2018 (requesting a magnifying lens to see small print), August 31, 2018 (complaining of severe pain and requesting to see the doctor), September 3, 2018 ("need medical attention" and requested to see the doctor sooner than October 11, 2018 appointment), September 4, 2018 ("ankle injury/need meds from CDCR" and wanting to see the doctor), September 5, 2018 (twice) (complaining that he was not getting Trileptal and requesting a mental health exam), and September 10, 2018 (requesting earlier

---

[4] Ibuprofen is also referred to as Motrin in the medical records.

4

appointment to see the doctor). *Id.* In response to each of his white cards related to his chronic pain during this period, an ACHS nurse assessed Mr. Williams and determined that he should continue Ibuprofen pending his scheduled exam with a doctor. Dkt. No. 24-1 at 14-22 (Ex. B at 9-16). In addition, on September 10, 2018, psychiatrist Samina Khan, M.D. met with Mr. Williams for a psychiatric assessment and found no indication of a need for psychiatric-related care. Dkt. No. 24-1 ¶ 6; Dkt. No. 24-1 at 37-41 (Ex. B at 31-35).

On September 11, 2018, ACHS received a telephone call from the Public Defender's office advising that Mr. Williams would be returning to state prison on September 21, 2018 and asking that he be seen by an ACHS physician before he left the County Jail. Dkt. No. 24-1 ¶ 6; Dkt. No. 24-1 at 24 (Ex. B at 18). In response to this request, the County Jail re-scheduled Mr. Williams's physician appointment for September 17, 2018. Dkt. No. 24-1 ¶ 6. Meanwhile, Mr. Williams submitted additional white cards on September 11, 2018 (requesting medicine for a cold), September 12, 2018 (twice) (to see the doctor before his pending transfer on September 21, 2018), and September 15, 2018 (requesting to see the doctor and complaining that he was being denied prescription medication for his chronic pain). Dkt. No. 24-1 at 22-27 (Ex. B at 16-21).

According to Mr. Williams, he submitted a written "sick call request" to see the doctor every day from August 23, 2018 to approximately September 27, 2018, but was denied medical attention and medical care. Dkt. No. 1-1 at 5, ¶ 5. He says that he made daily inquiries to the pill call nurse about his pain medication and about when the doctor would see him but was treated indifferently by medical staff. *Id.* ¶ 6.

On September 17, 2018, approximately 25 days after his transfer to County Jail, ACHS physician Emilee Wilhelm-Leen, M.D. examined Mr. Williams. Dkt. No. 24-1 ¶ 7; Dkt. No. 24-1 at 41-46 (Ex. B at 35-40). Dr. Wilhelm-Leen obtained a detailed history from Mr. Williams, which included his complaints about his state prison care for his right knee and right ankle. Dkt. No. 24-1 ¶ 7; Dkt. No. 24-1 at 42 (Ex. B at 36). Mr. Williams told Dr. Wilhelm-Leen that he had tried Motrin (Ibuprofen) and Tylenol as well as Naprosyn, Celebrex, and Gabapentin, and all were not effective in addressing his pain. *Id.* Mr. Williams also said that he recently started on Trileptal but it was "not helping either." *Id.* Dr. Wilhelm-Leen noted that Mr. Williams's right

knee extension was limited by pain and that he had full range of motion of his right ankle but evidence of small skin wounds. *Id.* Dr. Wilhelm-Leen diagnosed right ankle pain associated with suspected chronic/post traumatic arthritis and ordered an x-ray to ensure anatomic alignment from a prior surgery. Dkt. No. 24-1 ¶ 7; Dkt. No. 24-1 at 46 (Ex. B at 40). The right ankle x-ray confirmed evidence of hardware from a prior surgery and absence of any acute fracture or dislocation. Dkt. No. 24-1 ¶ 7; Dkt. No. 24-1 at 46-48 (Ex. B at 40-42). Dr. Wilhelm-Leen then prescribed Voltaren for pain and daily wound care of the small uninfected wounds confirmed during her exam. Dkt. No. 24-1 ¶ 7; Dkt. No. 24-1 at 46 (Ex. B at 40). Dr. Wilhelm-Leen also advised Mr. Williams to participate in physical therapy as recommended by his state prison physician. *Id.* According to Mr. Williams, Dr. Wilhelm-Leen refused to approve the Trileptal medication that was prescribed by the CDCR doctors. Dkt. No. 1-1 at 6-7, ¶ 11.

From September 25, 2018, until his transfer back to KVSP on October 3, 2018, Mr. Williams submitted multiple white cards, complaining that Voltaren was ineffective for pain control, and was assessed repeatedly by ACHS nurses. Dkt. No. 24-1 at 31-34 (Ex. B at 25-28).

On October 2, 2018, ACHS physician Kristen Walsh reviewed Mr. Williams's chart and authorized a change of pain medication from Voltaren to Naprosyn. Dkt. No. 24-1 ¶ 8; Dkt. No. 24-1 at 35-36 (Ex. B at 29-30). Mr. Williams was transferred back to state prison on October 3, 2018. Dkt. No. 24-1 ¶ 8.

### D. Defendant Sheriff Smith's Supervision of the County Jail

Sheriff Smith has served as the Sheriff of Santa Clara County since January 1998. Dkt. No. 24-3 ¶ 2. She says that she delegated oversight of Custody Operations to Assistant Sheriff Eric Taylor from August 2018 through October 2018. *Id.* ¶ 3. Sheriff Smith says she was not directly involved in the day-to-day oversight of Custody Operations, except in rare circumstances. *Id.*

Sheriff Smiths says that all medical, mental health, and dental services are provided to prisoners housed in Custody facilities through ACHS, and that Dr. Chyorny has been the ACHS Medical Director since 2018. *Id.* ¶ 4. Sheriff Smith acknowledges that she has oversight responsibility to ensure the provision of emergency and basic health care services to all prisoners,

6

but that medical, dental, and mental health matters involving clinical judgment are the sole province of the responsible physician, dentist, psychiatrist, and psychologist respectively, as provided under 15 California Code of Regulations § 1200. *Id.*

Sheriff Smith says that at no time was she personally involved in any decision-making concerning provision of medical care to Mr. Williams. *Id.* ¶ 5. Rather, all such decisions were made by medical personnel employed with ACHS and supervised by Dr. Chyorny. *Id.* Sheriff Smith says that she did not learn of Mr. Williams's concerns about his medical care until after this lawsuit was filed. *Id.* Mr. Williams does not dispute those portions of Sheriff Smith's declaration regarding her delegation of Custody Operations to an Assistant Sheriff or her lack of knowledge about or involvement in his medical care. *See* Dkt. No. 28.

## II. LEGAL STANDARD

Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue for trial exists if the nonmoving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248–49. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production either (1) by "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, by "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210

F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324–25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Anderson*, 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

## III. DISCUSSION

### A. Eighth Amendment Deliberate Indifference

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the prisoner's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id*. The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A prison official is deliberately indifferent to a prisoner's health and safety if he knows that the prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S.

at 837.  The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  *Id*.  If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.  *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).  More specifically, a prison official does not act with deliberate indifference solely because he or she adopts one course of treatment over another based solely on a difference of medical opinion.  *See Toguchi v. Chung*, 391 F.3d 1051, 1058, 1059-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).  In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment chosen was medically unacceptable under the circumstances and that prison medical authorities chose that course of treatment in conscious disregard of an excessive risk to plaintiff's health.  *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

Mr. Williams bears the burden of proof at trial on his Eighth Amendment claim.  For the purposes of her summary judgment motion, Sheriff Smith does not dispute that Mr. Williams's chronic pain qualifies as a serious medical need.  Dkt. No. 24 at 14.  Rather, Sheriff Smith contends that the undisputed material facts show that the ACHS physicians' determinations regarding the appropriate medication for treatment of Mr. Williams's pain and the scheduling of his physician appointments do not constitute deliberate indifference to Mr. Williams's medical needs, as a matter of law.  *Id.*

After a careful review of the evidence, the Court finds that there are no genuine issues of material fact as to whether the County Jail medical staff acted with deliberate indifference in treating Mr. Williams's chronic pain.  First, with respect to Mr. Williams's allegations that he suffered needlessly because medical staff refused to provide him with Trileptal (as prescribed by his state prison doctors) and gave him Ibuprofen instead, there is no evidence that medical staff

refused to give him Trileptal knowing that it (and not Ibuprofen) would be effective against his pain. Sheriff Smith points out that shortly before he was transferred to the County Jail, Mr. Williams complained that *Trileptal* was ineffective, a complaint he repeated to the intake nurse upon his arrival at the County Jail. Dkt. No. 24 at 15. Accordingly, it cannot be said that medical staff was aware that Mr. Williams would face a substantial risk of serious harm if they chose to provide Mr. Williams with an alternative to Trileptal, as he had just informed them Trileptal was ineffective.

Second, the undisputed facts indicate that the County Jail medical staff determined that Trileptal was not an appropriate medication to treat Mr. Williams's chronic pain because of potentially serious adverse side effects. Mr. Williams does not challenge this evidence. Thus, it appears that the County Jail's decision not to given Mr. Williams Trileptal, even though it had been prescribed by his state prison doctor, was based on a difference of opinion over the appropriate course of treatment. Such a difference of opinion between the County Jail medical staff and the state prison doctors is insufficient to support a claim that the County Jail acted with deliberate indifference. *See Toguchi*, 391 F.3d at 1058.

Third, Mr. Williams does not explain how administration of Ibuprofen in lieu of Trileptal was medically unacceptable under the circumstances and exposed him to excessive health risks. Although Mr. Willliams does contend that Ibuprofen, like Trileptal, proved to be insufficient to relief his pain, he does not dispute that, given the potential adverse side effects associated with Trileptal, Ibuprofen was a medically acceptable, "appropriate first-line alternative." In fact, Mr. Williams does not point to any other medication or course of treatment that he believes would be effective to treat his pain and that, in his view, the County Jail should have provided for him.

Fourth, Mr. Williams identifies no evidence showing that medical staff knew providing him Ibuprofen instead of Trileptal would cause him to needlessly suffer substantial pain. Rather, the undisputed evidence shows that ACHS nurses responded to each of Mr. Williams's numerous medical requests, conducted assessments, and concluded that it would be appropriate for a doctor to address any changes in his medication at the scheduled appointment. The County Jail advanced Mr. Williams's physician appointment to September 17, 2018 at his counsel's request. At that

1  appointment, Dr. Wilhelm-Leen did not disregard Mr. Williams's complaint that Ibuprofen was
2  ineffective but took reasonable steps to treat his pain by prescribing yet another pain medication,
3  Voltaren. *Id.* Unfortunately, Mr. Williams also found Voltaren ineffective after trying it for a
4  week, but this does not support a finding that Dr. Wilhelm-Leen or other medical staff at the
5  County Jail acted with deliberate indifference in their efforts to address Mr. Williams's pain
6  during the short time he was in the county's temporary custody.

7  The cases on which Mr. Williams principally relies are distinguishable. In *Snow v. McDaniel*, 681 F.3d 978, 986-988 (9th Cir. 2011), the Ninth Circuit concluded that state prison doctors acted with deliberate indifference when they chose to treat a prisoner's severe bilateral hip pain with pain medication rather than providing hip surgery as recommended by two specialists and the prisoner's primary care physician. In *Greeno v. Daley*, 414 F.3d 645, 650-652, 654-655 (7th Cir. 2005), the Seventh Circuit concluded that state prison doctors acted with deliberate indifference when they failed for two years to refer a prisoner for testing to rule out an ulcer, even though the prisoner complained of persistent severe heartburn and vomiting, had a family history of peptic ulcers, and one prison doctor twice noted in the prisoner's chart the need to rule out an ulcer. *Id.* When he was finally tested, the prisoner did indeed have an ulcer which was then treated successfully with surgery. *Id.* In *Lavender v. Lampert*, 242 F. Supp. 2d 821, 843 (D. Or. 2002), the district court concluded that state prison doctors acted with deliberate indifference when they delayed almost two years before prescribing orthopedic shoes for a prisoner who suffered from continuous foot pain and lesions when walking in regular shoes or with bare feet. *Id.* In *Scicluna v. Wells*, 345 F.3d 441, 443-444 (6th Cir. 2003), the Sixth Circuit concluded that prison doctors acted with deliberate indifference when they delayed twenty days in referring a prisoner for a neurosurgical consultation that was immediately necessary in preparation for surgery urgently needed to replace a portion of the prisoner's skull. In contrast to *Snow, Greeno*, *Lampert*, and *Scicluna*, Mr. Williams did not suffer a prolonged period of inattention to his medical needs or a failure to follow a clearly necessary and recommended course of treatment. Instead, during a period of 40 days, the County Jail made a reasonable determination about the suitability of Trileptal based on consideration of its side effects, prescribed an alternative pain medication, and

11

1    provided a physician appointment within 25 days of his arrival during which he received a

2    comprehensive assessment of his medical condition and also received yet another pain

3    medication.[5]  There is no evidence that the County Jail disregarded without a reasonable medical

4    basis any prescribed or recommended alternative course of treatment for Mr. Williams.

5         Because Sheriff Smith has demonstrated the absence of a genuine issue of material fact

6    with respect to Mr. Williams's claim that medical staff disregarded a substantial risk of harm with

7    regards to treatment of his chronic pain and failed to take reasonable steps to treat it, and because

8    no reasonable fact finder could conclude that the County Jail medical staff acted with deliberate

9    indifference, Sheriff Smith is entitled to summary judgment on this claim.  *See Celotex Corp.*, 477

10   U.S. at 323.

### B.    Supervisor Liability

12        Mr. Williams names only Sheriff Smith as a defendant in this action.  Dkt. No. 1-1 at 4.

13   He claims Sheriff Smith is responsible for violating his Eighth Amendment rights based on her

14   oversight of the County Jail operations and her purported awareness of the inadequacy of the

15   treatment provided by the County Jail medical staff.  *Id.* at 7-8.  He claims Sheriff Smith deprived

16   him of his right to reasonable and needed medical treatment to meet his serious medical needs.  *Id.*

17   at 8.  Sheriff Smith argues that she is not liable as a supervisor under § 1983.  Dkt. No. 24 at 17.

18        A supervisor may be liable under §1983 upon a showing of (1) personal involvement in the

19   constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful

20   conduct and the constitutional violation.  *Henry A. v. Willden*, 678 F.3d 991, 1003-04 (9th Cir.

21   2012).  Even if a supervisory official is not directly involved in the allegedly unconstitutional

22   conduct, "[a] supervisor can be liable in this individual capacity for his own culpable action or

23   inaction in the training, supervision, or control of his subordinates; for his acquiescence in the

24   constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

---

[5] The County Jail's conduct is also distinguishable from the facts presented in *McElligot v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999), where a prison doctor failed to prescribe any pain medication whatsoever over a period of four months for a prisoner the doctor knew was suffering severe pain, vomiting, and experiencing a marked overall deterioration in his health, including weight loss.

rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (citation omitted). The claim that a supervisory official "knew of unconstitutional conditions and 'culpable actions of his subordinates' but failed to act amounts to 'acquiescence in the unconstitutional conduct of his subordinates' and is 'sufficient to state a claim of supervisory liability.'" *Keates v. Koile,* 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting *Starr*, 652 F.3d at 1208) (finding that conclusory allegations that supervisor promulgated unconstitutional policies and procedures which authorized unconstitutional conduct of subordinates do not suffice to state a claim of supervisory liability); *Wilk v. Neven*, 956 F.3d 1143, 1146 (9th Cir. 2020) (a reasonable factfinder could find the warden liable as supervisor in a failure-to-protect suit because only the warden or his designee had the authority to add a person to an inmate's enemy list and there was evidence plaintiff submitted a request to place an inmate, who later attacked him, on the list).

Even if Mr. Williams could show a triable issue of fact regarding deliberate indifference to a serious medical need, he has not offered any evidence suggesting Sheriff Smith could be liable as a supervisor with respect to his medical treatment. It is undisputed that Sheriff Smith was not personally aware of Mr. Williams's medical condition or his complaints about his treatment until after he filed this action against her. *See supra* at 7. It is also undisputed that during the relevant time, Sheriff Smith had delegated oversight of Custody Operations to an Assistant Sheriff, and that all clinical judgments regarding Mr. Williams's medical treatment were made by the responsible physicians and medical staff under the supervision of Dr. Chyorny. *Id.*

Mr. Williams speculates that Sheriff Smith must have known about unconstitutional conditions at the County Jail because of the pendency of a class action lawsuit. Dkt. No. 28 at 23-24. Mr. Williams asserts that the lawsuit dealt with the same issues that he was experiencing at the facility, including the "delivery of medical care to inmates," and that it demonstrates a "long history of delay [and] ineffective medical treatment at the Santa Clara County Jail." *Id.* at 24. However, the Court is not persuaded that Sheriff Smith's knowledge of Mr. Williams's medical needs reasonably can be inferred based on the mere existence of a class action lawsuit against Santa Clara County, even if that lawsuit included allegations that conditions of confinement, including medical care, were unconstitutional. Dkt. No. 24 at 7-8. There is simply no evidence to

13

1 support Mr. Williams's assertion that Sheriff Smith "must have" known of his specific medical
2 needs and treatment or that she engaged in some misconduct that caused the purported
3 constitutional violation.
4     For this reason also, the Court concludes that there is no genuine dispute of material fact
5 concerning Sheriff Smith's role with respect to Mr. Williams's medical treatment and that she is
6 entitled to summary judgment with respect to Mr. Williams's claim that she is liable as a
7 supervisor. *See Celotex Corp.*, 477 U.S. at 323.

**IV. CONCLUSION**

    For the foregoing reasons, Defendant Sheriff Laurie Smith's motion for summary judgment is granted. Dkt. No. 24. The Court will enter judgment accordingly.

    The Clerk shall terminate any other pending motions as moot and close the case.

    This order terminates Docket No. 24.

**IT IS SO ORDERED.**

Dated: March 24, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge